UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JENNIFER LEIGH MCLEAN and<br>JOSH FRANCIS DESJARLAIS<br>O'CONNOR,<br><br>    Plaintiffs,<br><br>v.<br><br>NEW ENGLAND DONOR SERVICES<br>and BOSTON MEDICAL CENTER,<br><br>    Defendants. | Civil Action No. 22-CV-11003-NMG |

## MEMORANDUM AND ORDER

**A. KELLEY, D.J.**

On Sunday, June 26, 2022, following her early morning calls to the Court's emergency telephone number, Plaintiff Jennifer Leigh McLean ("McLean") filed suit on behalf of herself and her adult son, Josh Francis Desjarlais O'Connor ("O'Connor"), to prevent Defendants New England Donor Services ("NEDS") and Boston Medical Center ("BMC") from imminently withdrawing life-support from O'Connor, who was declared brain dead[1] on June 18, 2022, and proceeding with harvesting his organs in accordance with his election to be an organ donor. [Dkt. 1]. Unlike her telephone calls to the Court, McLean's filed complaint did not expressly request a preliminary injunction. However, the Court understood McLean to be seeking a preliminary injunction based upon the combination of her calls and complaint, and it issued an "emergency restraining order preventing the defendants from taking actions that [would] result in

---

[1] Although the Court uses "brain dead" and "brain death" throughout this memorandum, it does so in recognition of the medical and legal terms used in Massachusetts. The Court appreciates that this phrase may appear to some as insensitive; it is not the Court's intent to cause more harm to a grieving family.

the cessation of life." [Dkt. 3]. NEDS then filed an Emergency Motion to Revoke Emergency Restraining Order, asserting that cessation of life occurred eight days earlier when O'Connor was declared brain dead. [Dkt. 5]. Given the importance of the issues presented and concern over the viability of the organs, the Court convened an evidentiary hearing that same day, where the Court heard from all parties and a witness. For the reasons that follow, the Court **DENIES** McLean's request for a preliminary injunction and **GRANTS** Defendants' Emergency Motion to Revoke Emergency Restraining Order.[2]

**I.    Background**

O'Connor was admitted to BMC on June 16, 2022, after suffering a cardiac incident that resulted in brain injury. [Dkt. 14 at 2]. He had no brain stem reflexes upon arrival at the hospital, and he was treated by several physicians. [Id.; Dkts. 5-1, 5-2]. At 7:30 PM on June 18, 2022, Dr. Charlene Ong declared O'Connor brain dead after performing a clinical examination and ordering ancillary testing. [Dkt. 5-1]. Specifically, Dr. Ong found that O'Connor was in an "irreversible" coma with a known cause, and she noted O'Connor had "unreactive fixed dilated pupils" and did not react to various stimuli, all of which is "consistent with brain death." [Id. at 1-2]. BMC pursued ancillary testing, rather than an apnea test, due to the presence of fentanyl in O'Connor's system. [Id. at 2]. The ancillary testing, a nuclear cerebral blood flow study, indicated that there was "[n]o blood flow to the brain, in a pattern compatible with the suspected brain death." [Id.]. Dr. Sara Melbom confirmed the results of the ancillary testing, explaining that the "brain perfusion scan demonstrates that there is no intracranial blood flow to the brain," which is "compatible with the suspected brain death," and "[n]o activity [was] seen within the

---

[2] There remain outstanding legal questions, including jurisdictional and standing issues, related to McLean's ability to request a preliminary injunction and bring a medical malpractice suit on behalf of her son against the defendants. Those issues, however, have not been adequately briefed, and given the urgent nature of the relief requested, the Court does not address them here.

skull." [Dkt. 5-2 at 1-2]. The following day, Dr. Andrew Berical also evaluated O'Connor and reviewed the findings with Dr. Lauren Kearney, an intensive care fellow. [Dkt. 14]. Dr. Berical noted that O'Connor had "absent brain stem reflexes," among other absent reflexes, and that O'Connor had "no response to noxious stimulus" and his pupils were "fixed, dilated, and unresponsive to light." [Id. at 3]. He also reviewed the ancillary testing and agreed with the declaration of brain death. [Id.].

O'Connor, who was from Virginia, registered to be an organ donor in February 2012 pursuant to the Virginia Revised Uniform Anatomical Gift Act, VA Code § 32.1-201.1 et seq. [Dkt. 5-3]. Approximately twenty years old at the time he agreed to be a donor, O'Connor elected to gift "all organs, eyes and tissues for transplantation, research, education and therapy." [Id.]. The Virginia "Verification of Document of Gift" provides that if "the Donor is over the age of 18 at death, the donor's decision is final and must be honored. No one can amend or revoke the Donor's decision unless the Donor expressly gave them authority to do so." [Id.].

McLean claims that O'Connor is "still showing signs of life" and seeks to prevent BMC and NEDS from withdrawing life-support services and harvesting O'Connor's organs.[3] [See Dkt. 1 at 4]. O'Connor was comatose when admitted to BMC on June 16, 2022, and he was first declared brain dead two days later, in the evening of June 18, 2022. [E.g., Dkt. 5-1 at 1]. McLean requested a second opinion from a different hospital around June 20, 2022 [Dkt. 9-2 at 1], and BMC allowed McLean until the early evening of June 24, 2022, to find another hospital that would accept O'Connor for a transfer [Dkt. 9-1 at 2]. Although BMC reached out to a U.S. Navy hospital at McLean's request, that facility declined to accept O'Connor. [Id.; Dkt. 14 at 4-

---

[3] Although McLean has made some brief references to a violation of O'Connor's religious freedom and the First Amendment in her complaint, her description of her grievances at the hearing demonstrates that her legal claims rest on allegations of medical malpractice. [See Dkt. 1 at 3-4].

5]. BMC ultimately scheduled the organ harvesting procedure for June 26, 2022, at 5:00 AM, resulting in McLean's final efforts to obtain judicial intervention in the early morning hours. [See Dkt. 5 at 1]. The Court convened an emergency hearing on June 26, 2022, the same day McLean filed her complaint, to gather evidence to aid in the resolution of the parties' various requests. The crucial question at the center of that hearing was whether O'Connor was declared medically and legally brain dead pursuant to accepted medical standards. If so, the plans for O'Connor's organ donation could proceed, as O'Connor had elected to be a donor. The purpose of this hearing was not to address the overall merits of McLean's medical malpractice allegations.

At that hearing, McLean explained that the "signs of life" she believed O'Connor to be exhibiting included sweating, pupil movement, and hand grasping. Dr. Anna Cervantes-Arslanian, Chief of Neurocritical Care at BMC and one of several attending physicians who treated O'Connor, provided medical testimony. She examined O'Connor within twenty-four hours of his arrival at BMC and noted that he was comatose and exhibited many signs of a dysfunctional brain stem. Although Dr. Cervantes-Arslanian did not make the ultimate declarations of death by brain criteria herself, she was familiar with his care, reviewed his medical records, and has experience making findings of brain death on many other occasions.

## II.     Legal Standard

A preliminary injunction is "an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). When considering a preliminary injunction, the Court must evaluate "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4)

the effect, if any, on the public interest." González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009) (quoting Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008)).  The party seeking the preliminary injunction "bears the burden of establishing that these four factors weigh in its favor." Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).  The district court's authority to issue a preliminary injunction should be "sparingly exercised," and preliminary injunctions that "do not preserve the status quo . . . should be granted only in those circumstances when the exigencies of the situation demand such relief." Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

### III.   Discussion

Although McLean's overarching claim appears to be one of medical malpractice, the question presented to the Court with respect to whether McLean is entitled to a preliminary injunction preventing BMC and NEDS from withdrawing life-support services and proceeding with the organ harvesting and donation is a narrower issue, i.e., whether O'Connor is medically and legally brain dead.[4]  Massachusetts law provides that death occurs when there is "irreversible cessation of all functions of the entire brain, including the brain stem," a determination that "shall be made in accordance with accepted medical standards." Mass. Gen. Laws ch. 190B, § 1-107.  As with other states, these medical standards are not set by any particular law and instead are "matters of private medical expertise and discretion" that are often

---

[4] The Court need not examine the validity of O'Connor's election to donate his organs, because this was not challenged at the hearing and O'Connor completed a "Document of Gift" to donate his organs "in accordance with the Virginia Revised Uniform Anatomical Gift Act, VA Code § 32.1-291.1 et seq" in 2012, when he was a legally consenting adult, providing that he "wish[ed] to donate all organs, eyes and tissues for transplantation, research, education and therapy." [Dkt. 5-3].  Because he was over eighteen at the time of his execution of this form and his death, that decision "is final and must be honored." [Id.]; see Mass. Gen. Laws ch. 113A, § 19 (noting that a document of gift shall be valid if executed in accordance with the laws of the state where it was executed).

"the subject of guidelines published by professional medical organizations." <u>Fonesca v. Kaiser Permanente Med. Ctr. Roseville</u>, 222 F. Supp. 3d 850, 864 (E.D. Cal. 2016). Dr. Cervantes-Arslanian explained that professional organizations including the American Academy of Neurology and the Neurocritical Society provide guidelines for brain death criteria. <u>See</u> https://www.neurocriticalcare.org/education/digital-education/brain-death-toolkit; https://www.aan.com/PressRoom/Home/PressRelease/842. At BMC, physicians consider five factors before declaring brain death. First, they must know the injury or cause of the potential brain death. Second, they determine whether imaging is consistent with brain death. Third, they evaluate whether the patient is in a coma, which occurs when there is no response to external stimulation, including painful stimulation. Fourth, they examine whether there is any brain or brain stem function. To do so, they assess the cranial nerve and movement of the arms and legs, in addition to brain stem reflexes like pupil response and gagging. Fifth, they perform an apnea test, which requires taking the patient off a ventilator and evaluating respiratory function. If they are unable to complete an apnea test, they utilize an ancillary study. They cannot perform an apnea test if other factors would interfere with a patient's ability to breathe independently, such as fentanyl in the system. This multi-step process is similar to that recommended by the American Academy of Neurology. <u>Id.</u> BMC's policy is to have two doctors perform a clinical examination before declaring brain death, with the examinations performed at least one hour apart.[5]

Here, the doctors' clinical examinations and ancillary testing of O'Connor indicated an irreversible cessation of all functions of the brain, including the brain stem, thereby rendering

---

[5] The "Declaration Form for Death by Brain Criteria" provides that the clinical examination must assess whether the patient is experiencing (1) coma with cerebral unresponsiveness, (2) absent brain stem reflexes, (3) apnea, which can be confirmed only by disconnecting the ventilator, and (4) that these conditions persist. [Dkt. 5-1 at 1].

him brain dead. BMC knew O'Connor had suffered a cardiac episode requiring resuscitation, and he arrived at BMC comatose and showing signs that his brain stem was dysfunctional. [See, e.g., Dkt. 14 at 2]. Dr. Ong found that O'Connor was in an irreversible coma, which was supported by neuroimaging. [Dkt. 5-1 at 2]. She also noted that O'Connor had "unreactive fixed dilated pupils, no corneal reflexes . . . no ocular cephalic reflex, no cough, no gag, [and] no movement to noxious stimuli consistent with brain death." [Id.]. BMC pursued an ancillary study, rather than apnea testing, because fentanyl was present in O'Connor's system, which could have confounded a clinical exam, and the medical team worried O'Connor "would not be able to tolerate an apnea test." [Id.]. The ancillary study, a nuclear cerebral blood flow study, indicated there was "[n]o blood flow to the brain, in a pattern compatible with the suspected brain death." Id. Dr. Berical also examined O'Connor after Dr. Ong declared him brain dead. Dr. Berical similarly noted that during his exam, O'Connor had "absent brain stem reflexes," "no gag / no cough reflexes," "absent corneal reflexes," and "no response to noxious stimulus," and O'Connor's "pupils [were] fixed, dilated, and unresponsive to light." [Dkt. 14 at 3]. Dr. Berical also observed that O'Connor's early brain imaging, upon his arrival at BMC, was "consistent with anoxic brain injury" and the ancillary study "showed no blood flow to the brain, in a pattern compatible with brain death." [Id. at 2]. Given Dr. Ong and Dr. Berical's clinical examinations of O'Connor and their declaration of brain death, BMC's determination that O'Connor had experienced "irreversible cessation of all functions of the entire brain, including the brain stem," was "made in accordance with accepted medical standards," and he is medically and legally dead. See Mass. Gen. Laws ch. 190B, § 1-107. Dr. Melbom's confirmation that the ancillary study showing "no intracranial flow to the brain" was "compatible with the suspected brain death" and Dr. Cervantes-Arslanian's confirmation that the medical records indicate Mr.

O'Connor was examined by multiple doctors during his time at BMC only reinforce this conclusion.  [See Dkt. 5-2 at 1].

As to the "signs of life" McLean claims exist, Dr. Cervantes-Arslanian testified that there is no note of any medical personnel observing these occurrences in the medical records she reviewed.  Dr. Cervantes-Arslanian, herself, had not seen any pupil movement, and she explained that BMC employs a quantitative test to determine pupil movement.  While she acknowledged that, in rare occasions, pupils can have some change to them even after a patient has been declared brain dead, she did not think that was the case here.  Dr. Cervantes-Arslanian stated that the scans she reviewed contradicted the possibility that there was any pupil movement, as the scans show that the mid-brain, which is responsible for pupil movement, was destroyed and did not have any blood flow.  If O'Connor's pupils did move, it happened because of a spinal cord reflex, not because of brain activity.  Spinal cord reflexes, which are part of the autonomic nervous system, also explained the sweating and other "signs of life" McLean described.  Based on her review of O'Connor's medical records and her experience, Dr. Cervantes-Arslanian believed the guidelines regarding the declaration of brain death were followed and that O'Connor was accurately declared brain dead.

Because BMC has declared O'Connor medically and legally dead in accordance with accepted medical standards and an individual's decision to donate organs after death "shall be complied with and shall not require the consent or concurrence of any other individual after the donor's death," the Court finds that McLean is not entitled to a preliminary injunction preventing BMC and NEDS from withdrawing life-support services and proceeding with the organ harvesting and donation, as she has not successfully established any legal claim entitling her to

such relief.[6]  Mass. Gen. Laws ch. 113A, § 23.  While this is sufficient to end the Court's inquiry, the Court briefly examines the remaining preliminary injunction factors.  See Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2010) (explaining that "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity" (citation omitted)).  As to the second element—irreparable harm—the Court agrees that any harm McLean would experience in the absence of an injunction already occurred when O'Connor was declared medically and legally dead on June 18, 2022.  O'Connor elected to be an organ donor and fulfilling that wish does not do further harm.  The third and fourth factors—the burden on the defendants and the effect on the public interest—also weigh in favor of denying McLean's request for a preliminary injunction.  Not allowing the donation of O'Connor's organs pursuant to his wishes threatens the lives of at least four individuals waiting for life-saving transplants.  [See Dkt. 5 at 1; Dkt. 12 at 3].  Moreover, the preface to the Uniform Anatomical Gift Act of 2006 (the "UAGA") notes that the number of individuals on the waiting list for organ transplants keeps growing, and another person dies every hour in the United States because there is no organ available for a life-saving transplant, which "results from the lack of organ donors."  The UAGA states that "there were 13,091 individuals who died under the age of 70 using cardiac and brain death criteria and who were eligible to be organ donors" in 2005, and barely half of those individuals were, in fact, donors.  Prefatory Note to the Revised Uniform Anatomical Gift Act (2006); see also Lyon v. United States, 843 F. Supp. 531, 536 (D. Minn. 1994) (noting that one policy interest motivating the UAGA is "the need for donations of eyes and other organs for transplantation and research purposes" and

---

[6] Nothing in this memorandum shall be construed as a statement regarding the viability of McLean's medical malpractice claim, nor shall the Court's decision today be given preclusive effect with respect to any later malpractice claims.

"[t]ime is usually of the essence in securing donated organs at the time of the donor's death"). While the Court respects and regrets the pain McLean is feeling upon the death of her son, the balance of equities is in Defendants' favor.

### IV.     Conclusion

For the foregoing reasons, McLean's request for a preliminary injunction is **DENIED** and Defendants' Emergency Motion to Revoke Emergency Restraining Order [Dkt. 5] is **GRANTED**.

**SO ORDERED.**

Dated: June 28, 2022                                          /s/ Angel Kelley
                                                              Hon. Angel Kelley
                                                              United States District Judge